**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Olga A. Howard, | ) | No. CV-04-2196-PHX-ECV |
| Plaintiff, | ) ) | **FINDINGS OF FACT AND** |
| vs. | ) ) | **CONCLUSIONS OF LAW AND JUDGMENT** |
| Bank of America NA, | ) ) ) | |
| Defendant. | ) ) | |
| | ) | |

The court finds as follows (findings of fact and conclusions of law are intermingled):

1.      Plaintiff Olga Howard ("Plaintiff") worked as a Senior Loan Specialist at Bank of America's ("Defendant") newly formed consumer Loan Center located in Gilbert, Arizona. First mortgage real estate loans were processed at the Center in a department managed by Carl Waltz. Two Team Leads, Lois Fillmore of the Standard Loan Team, and Ricky Lee of the Paper Saver Team, reported to Mr. Waltz.  Beth Alberts worked first on the Standard Loan Team, then on the Paper Saver Team, where she was promoted to Work Flow Coordinator in December 2003.  Waltz and Alberts were the only witnesses presented by Defendant at trial.

2.      Loan applications were obtained by Account Executives.  The applications were reviewed by Underwriting for credit worthiness.  The Set Up Team then created a checklist for processing.  Processors, such as Plaintiff, then processed the loan.  When

processing was completed, the loan was delivered to Closing for completion of the transaction.

3. As a Senior Loan Specialist, Plaintiff was responsible for ensuring that assigned loan files were completed in advance of scheduled loan closing dates. She was to gather the information on the loan checklist, maintain the information in an orderly fashion in the file, keep customers updated, keep a current log of events on the computer notepad and meet all other Loan Processing System requirements.

4. Plaintiff was expected to provide a high level of customer satisfaction and interrelate with Account Executives, Underwriting, Closing, team members and management in a positive, respectful manner.

5. If needed information was placed in the wrong file, or missing from or difficult to locate in the loan file, and if a loan file was not worked in a timely manner, Defendant's ability to close the loan as scheduled was impaired.

6. All new employees, including Plaintiff, were afforded classroom training directly after hire, as well as additional on-the-job training and coaching.

7. After completing her classroom training, Plaintiff was assigned to the Standard Loan Team with Ms. Fillmore as her Team Lead.

8. Defendant's Advice & Counsel Unit ("A&C") serves as Defendant's human resources department and takes calls regarding concerns from Defendant's management and from employees, documenting the calls in "Siebel Notes." The notes were prepared by various people, none of whom testified.

9. Mr. Waltz' management style was to allow his Team Leads to manage their Teams, keeping him informed, and when performance was a concern, to encourage the Team Leads to contact A&C for guidance as well.

10. Commencing on September 17, 2003, and continuing through February 2004, several of Plaintiff's supervisors contacted A&C to note Plaintiff's alleged substandard performance. Plaintiff was not advised of nor was she otherwise aware of any of these communications.

11.     On February 23, 2004, Plaintiff called A&C to complain about alleged acts of Mr. Lee in October, 2003, that she believed to be sexual harassment.   Plaintiff also complained about other work related matters.  (Ex. 205, 206)

12.     Defendant's sexual harassment manual required the company to make a thorough investigation of such complaints. (Ex. 118)  However, the record does not reflect that A&C did anything specific to investigate the complaint.  Nevertheless, A&C advised Plaintiff that her concerns had been addressed. (Ex. 207)

13.     Mr. Waltz and Mr. Lee were made aware of Plaintiff's complaint.

14.     Within three weeks after making her complaint (March 15 and 16, 2004) (Ex. 200, 201) Plaintiff received two written warnings outlining deficient performance.  These were the first written complaints received by Plaintiff in the 7 ½ months she had been employed by Defendant.  Plaintiff denied the allegations.

15.     Prior to this time, Plaintiff, along with other employees, had received awards for their performance.  Plaintiff denied that prior to receiving these written notices anyone had complained about her performance.

16.     Both the March 15 and the March 16 written counselings concluded with the warning: "Failure to meet expectations may result in disciplinary action up to and including termination."  (Ex. 200, 201)

17.     Plaintiff also received a written counseling dated April 1, 2004, summarizing alleged performance and behavioral problems.   (Ex. 210) The complaints, with two exceptions, were general and nonspecific.  This written counseling also contained the "may result in disciplinary action" language.  Plaintiff was fired on April 6, 2004, some six weeks after she complained about Lee's alleged sexual harassment.

18.     In the 15 months the loan unit was active at the Gilbert facility, no employee of the unit other than Plaintiff was ever fired for "substandard performance."

19.     Defendant did not present any objective, written standards of performance.  Nor did Defendant point to any loans that did not close directly as a result of Plaintiff's

1  nonperformance.  Exhibit 100 showed that Plaintiff rated in the high 80s for "customer
2  satisfaction."

3      20.  Waltz conducted no independent evaluation of Plaintiff's performance before
4  deciding to terminate her.  He relied primarily on Lee, Plaintiff's supervisor, who had
5  allegedly harassed her.  Waltz had no knowledge of Plaintiff's customer satisfaction survey
6  or awards.  Waltz could not point to any loans supervised by Plaintiff that did not close as
7  a result of her "substandard performance."

8      21.  The funding report pertaining to Plaintiff dated March 26, 2004 (Ex. 216)
9  shows the assignment of 90 loan files to Plaintiff.  Lee mentions only two files  as problem
10  files in his two writeups.  (Ex. 201, 210) One file, #6976525374, is not even listed among the
11  90 files shown on Exhibit 216.  The other file, #6975962553, was not even approved until
12  March 16, 2004, the same date on which Lee said there was a problem. (Ex. 201) Moreover,
13  the date Plaintiff sent the documents for closing was March 22, 2004, a day before the
14  estimated closing date of March 23, 2004. (Ex. 216)

15      22.  Defendant relied upon two e-mails to show Plaintiff's alleged "substandard
16  performance." (Ex. 202)  The first was from Maria Gallo dated March 3, 2004, in which
17  Plaintiff is criticized for not returning voice mails and e-mails from an account executive on
18  a loan whose interest rate lock was to expire on March 9.  That loans is #6210737083 on
19  Exhibit 216.  The undisputed testimony was that Plaintiff was out of the office sick from
20  February 23 to 27, having been sent back home by Lee on the 26th.  The persons responsible
21  for returning phone calls and e-mails during that week were Lee, Plaintiff's direct supervisor,
22  and Ms. Alberts, the workflow coordinator.  Plaintiff cannot reasonably be faulted for failing
23  to return phone calls during that period.  Moreover, like the other loan, it closed as scheduled.

24      23.  The second e-mail relied upon by Defendant is from Lisa Eddy and is dated
25  March 16, 2004. (Ex. 202)  Ms. Eddy complains to Mr. Waltz that "this is not the first time
26  Olga has dropped a file" and that "the rate expires in 2 days and the file has not been
27  touched." (Ex. 202)  Exhibit 216 belies Ms. Eddy's contention.  Ms. Eddy was the account
28  executive for two loans handled by Plaintiff in March 2004. (Ex. 216)  One loan was loan

1    #6553121143, whose lock expiration date was March 31, 2004, and was a loan which had

2    not even been approved by March 26, 2004, much less March 16, 2004.  Plaintiff could not

3    have "dropped" that loan as of March 16, 2004.  The other loan Ms. Eddy complained about

4    was #6975962553.  Ms. Eddy's complaint again is not supported because the lock expiration

5    date was not two days away but was March 25, 2004, some nine days away. (Ex. 216)  Also

6    loan #6975962553 did not receive final approval until March 16, 2004.

7         24.    Plaintiff did not remove any of Defendant's confidential files or information

8    from the office.

9         25.    Plaintiff's case is one for retaliation.  A prima facie case for a retaliation claim

10   under Title VII is established by showing: (1) that the employee engaged in protected

11   activity, (2) that the employee suffered an adverse employment action, and (3) that there is

12   a causal link between the protected activity and the employer's action.  Hernandez v.

13   Spacelabs Medical Inc., 343 F.3d 1107, 1113 (9th Cir. 2003).

14         If a plaintiff establishes a prima facie case, the burden shifts to the employer

15   "to articulate a legitimate and nondiscriminatory reason for the adverse employment action

16   at issue." Id. at 1112.  If the employer presents a nondiscriminatory reason, the plaintiff must

17   present evidence to show that the employer's reason is pretextual.   Id.   This may be

18   accomplished either "'by directly persuading the court that a discriminatory reason more

19   likely motivated the employer or indirectly by showing that the employer's proffered

20   explanation is unworthy of credence.'" Stegall v. Citadel Broadcasting Company, 350 F.3d

21   1061, 1066 (9th Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

22   256 (1981).  A plaintiff may, as in all civil cases, use either direct or circumstantial evidence

23   to prove retaliation.  Stegall, 350 F.3d at 1066.  However, evidence of pretext must be

24   "specific" and "substantial."  Id.  To make a showing of pretext, a plaintiff may rely on the

25   evidence presented in support of his prima facie case.  Hernandez, 343 F.3d at 1112-13.

26         As stated above, Plaintiff contacted A&C on February 23, 2004, and reported that she

27   believed she was being discriminated against because of her refusal to date Lee.  Doc. #42

28   at ¶¶25-27.  Defendant does not dispute that Plaintiff's report to A&C was a protected

1    <u>activity</u>.  Nor is there a dispute that Defendant's decision to terminate Plaintiff's employment

2    on April 6, 2004, was an adverse employment action.  Regarding a causal link between the

3    two events, Waltz and Lee were aware of Plaintiff's complaints when Plaintiff was fired.

4    Also,  Plaintiff, who had never received anything in writing from Defendant prior to

5    February 23, 2004, other than awards and positive job performance reviews, now faced a

6    blizzard of written complaints.  Only a matter of days after she filed her EEOC complaint and

7    made Defendant aware of the complaint, she was fired.  The timing of these adverse actions

8    against Plaintiff culminating in her termination provides sufficient circumstantial evidence

9    to establish a prima facie case.  <u>See</u> <u>Bell v. Clackamas County</u>, 341 F.3d 858, 865 (9th Cir.

10   2003) ("Temporal proximity between protected activity and an adverse employment action

11   can by itself constitute sufficient circumstantial evidence of retaliation in some cases.")

12        As Plaintiff  established a prima facie case, it becomes Defendant's burden to

13   articulate a legitimate and nondiscriminatory reason for terminating Plaintiff's employment.

14   Defendant sustained its burden  through the assertion that Plaintiff was fired because of her

15   poor job performance.  Plaintiff must therefore present evidence to show that Defendant's

16   articulated reason is a pretext for retaliation.  Plaintiff must accomplish this by either

17   persuading the court that her complaint to A&C more likely motivated Defendant's action

18   or by showing that Defendant's proffered explanation is unworthy of credence.

19        The evidence in this regard presents the court with a tough decision.  One could

20   conclude that Plaintiff knew "the end was near" and, to thwart the inevitable, came up with

21   a throw away, dated, sexual harassment complaint.  There is a lot of evidence that would

22   support such a conclusion.  However, the case cannot be analyzed on the basis of the merit,

23   or lack of merit, of Plaintiff's harassment complaint or the timing thereof.  Plaintiff's

24   retaliation complaint must be decided through an evaluation of Defendant's motivation in

25   terminating Plaintiff's employment.  In that regard, although Defendant could have

26   terminated Plaintiff based on its perception of her work performance, by the smallest margin

27   imaginable the court concludes that the stated reasons were a pretext, i.e., that Plaintiff's

28   complaints more likely motivated Defendant's complaints.

1

2                                                    Damages

3          Plaintiff undertook reasonable efforts to obtain a comparable job after her termination.

4   Her choice to become a teacher's assistant because of the benefits, particularly medical

5   insurance, is not unreasonable.  At the age of 64, her choice not to drive the 40 miles round

6   trip to and from Tolleson to south Tempe to work in an America West call center in a job that

7   pays only marginally more in salary is not unreasonable.  Her choice to not work in other call

8   centers that do not provide medical insurance is not unreasonable.

9          Back pay damages under Title VII are determined by measuring the difference

10  between actual earnings for the period and those an employee would have earned absent the

11  retaliation (Gotthardt v. National Railroad Passenger Corporation, 191 F.3d 1148, 1158 (9th

12  Cir. 1999)).  Based upon the evidence, Plaintiff is entitled to back pay for the period from

13  April 6, 2004 through March 31, 2007 in the amount of $39,043.00.

14         Awards of "front pay" damages are appropriate where reinstatement of a Plaintiff is

15  impossible (Gotthardt, supra, at 191 F.3d 1156).  However, as Plaintiff did not conform with

16  the requirements of Busco v. United Air Lines, 239 F.3d 848, 862 (8th Cir. 2001), the court

17  declines to award front pay.

18         Defendant's assertion that it is entitled to limit Plaintiff's recovery of back pay to the

19  period ending November, 2005, based upon the cases McKennon v. Nashville Banner Pub.

20  Co., 115 S. C. 879, 886-887 (1995), O'Day v. McDonnell Douglas Helicopter Company, 79

21  F.3d 756, 761 (9th Cir. 1996), and Harper v. Godfrey, 45 F.3d 143, 149 (7th Cir. 1995) is

22  without merit.  Those cases are inapposite to the facts of this case.  In both McKennon and

23  O'Day, the after-discovered misconduct for which both employees could (and would) have

24  been fired (the removal of confidential documents from the workplace) occurred when those

25  persons were still employed by the companies.  It is unclear whether the employee whose

26  misconduct was discovered in Harper was or was not employed at the time of misconduct.

27  In any event, the court finds from the evidence that Plaintiff did not remove any of

28  Defendant's confidential records.

1    Accordingly, the court finds in favor of Plaintiff and against Defendant and awards

2 judgment in the sum of $39,043.00.

3    DATED this 17th day of May, 2007.

4

5

6

7

8

9

10

11

12

13

14    Edward C. Voss
      United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28